1

2

3

4

FILED IN THE
U.S. DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

Mar 01, 2024

SEAN F. McAVOY, CLERK

5

6

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WASHINGTON

7

8

9

10

11

12

13

14

15

16

| | |
|---|---|
| ESTATE OF JONNY TORRES, by and through his Personal Representative Manuel Banda; JAMIE VALENCIA, parent of Jonny Torres; MARIA M. TORRES, parent of Jonny Torres,<br><br>Plaintiffs,<br><br>v.<br><br>KENNEWICK SCHOOL DISTRICT NO. 17, a quasi-government agency and agents thereof with knowledge and responsibility; TAMARA VASQUEZ, individually and in her capacity as nurse at Highland Middle School,<br><br>Defendants. | No. 4:19-CV-05038-MKD<br><br>ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT<br><br>AND<br><br>DENYING THE ESTATE'S MOTION FOR PARTIAL SUMMARY JUDGMENT<br><br>**ECF No. 270, 445** |

17

18

19

20

Before the Court is Defendants Kennewick School District No. 17 ("KSD")

and Tamara Brun ("Nurse Brun") (collectively "Defendants' ") Motion for Partial

Summary Judgment, ECF No. 270, and Plaintiffs Estate of Jonny Torres, Jamie

Valencia, and Maria M. Torres (collectively "the Estate's") Motion for Partial

ORDER - 1

Summary Judgment on Breach and Cause, ECF No. 445.  On October 27, 2023, the Court held a hearing on the motions.  ECF No. 526.  Marcus Sweetser, Marshall Casey, and Isaiah Peterson appeared on behalf of the Estate.  Michael McFarland and Rachel Platin appeared on behalf of Defendants.

This case concerns the death of Jonny Torres ("Torres"), a student at KSD who visited Nurse Brun on the day that he had a severe medical event resulting in his death.  ECF No. 117.  The Estate brings claims under Title II of the Americans with Disabilities Act, 42 U.S.C. § 12131 *et seq.* ("ADA"), Section 504 of the Rehabilitation Act, 29 U.S.C. § 794 ("Section 504"), and 42 U.S.C. § 1983 ("Section 1983").  ECF No. 117.  The Estate seeks partial summary judgment, asking the Court to determine that Defendants violated the ADA, Section 504, and the Fourteenth Amendment of the United States Constitution as a matter of law.[1] ECF No. 445 at 4-10, 28-34.  KSD seeks summary judgment the Estate's federal causes of action.  ECF No. 270.

---

[1] The Estate also filed claims under state law and moves for partial summary judgment on those claims.  ECF No. 445 at 10-28, 34-36.  The state law claims will be addressed by a separate order.  *See* ECF Nos. 458, 515.

ORDER - 2

For the reasons stated herein, Defendants' Motion for Partial Summary Judgment is **GRANTED in part** and **DENIED in part**.  The Estate's Motion for Partial Summary Judgment as related to the Estate's federal claims is **DENIED**.

## BACKGROUND

The following facts are not genuinely in dispute unless otherwise noted. Torres began the 2017-18 school year as a sixth-grade student at Highlands Middle School ("HMS") on August 29, 2017.  ECF No. 438 at 2 ¶ 1; ECF No. 510 at 16 ¶ 1.  On the first day of school, Torres' mother, Maria Torres, went to HMS to drop off Torres's inhaler.  ECF No. 519 at 3 ¶¶ 7-9.  Ms. Torres told HMS staff to "follow the same protocol from Edison Elementary School" ("EES"), a KSD school that Torres attended the year prior.[2]  ECF No. 519 at 3 ¶ 8.  Ms. Torres told HMS staff about Torres's asthma and was told that the school had "all the information from [EES]."  ECF No. 519 at 3 ¶ 9.  Someone at the school gave Ms. Torres an Individual Health Plan ("IHP") form to take to Torres's doctor. ECF No. 519 at 3 ¶ 10.

---

[2] There is a dispute of fact as to whether Ms. Torres spoke with Nurse Brun or someone else at HMS.  *Compare* ECF No. 447-1 at 14-15 (Ms. Torres claimed she spoke with Nurse Brun) *with* ECF No. 491 at 2 ¶ 3 (Nurse Brun denies speaking with Ms. Torres).

1    Torres attended class from August 29 to September 1, then was absent on

2    September 5 and 6.  ECF No. 438 at 2 ¶ 2; ECF No. 510 at 16 ¶ 2; ECF No. 519 at

3    3 ¶ 12.

4    Ms. Torres took Torres to see Dr. Whitney Fix-Lanes on September 6, 2017.

5    ECF No. 519 at 3 ¶¶ 11, 13.  Dr. Fix-Lanes wrote a note that excused Torres's

6    absences and found him "able to return to school provided that he dose [sic] not

7    exercise or spend time outdoors while there is smoke in the air."  ECF No. 447-24

8    at 2 ("Fix-Lanes's note"); ECF No. 519 at 3 ¶ 13.  Dr. Fix-Lanes also filled out an

9    IHP form for "Asthma-Medication at School" that indicated Torres's asthma was

10   life-threatening and triggered by dust, pollen, mold, infection, cold air, exercise,

11   and smoke.  ECF No. 447-25 at 2.  The IHP outlines an "Action Plan" that includes

12   instructions on "Basic Management" and when to call 911.  ECF No. 447-25 at 2.

13   The IHP provides that Torres is to be given two puffs of his inhaler every four

14   hours.  ECF No. 447-25 at 2.  Ms. Torres immediately brought Fix-Lanes's note

15   and the IHP to HMS.  ECF No. 447-1 at 5-6; ECF No. 446 at 9 ¶ 40; ECF No. 490

16   at 5 ¶ 40.

17   Torres returned to HMS on September 7, 2017.  ECF No. 519 at 4 ¶ 23.

18   Torres met with KSD staff member Kristi Lakey and received an "admit slip" that

19   allowed him to return to his classes.  ECF No. 519 at 4 ¶ 23.  The admit slip is

20   signed 7:50 a.m.  ECF No. 447-14 at 2.  Torres told Lakey that his mother had

previously brought a doctor's note to the school.  ECF No. 519 at 5 ¶ 24.

Torres then went to the nurse's office and met with Nurse Brun.  ECF No. 438 at 3 ¶ 8; ECF No. 510 at 17 ¶ 8.  Nurse Brun found the IHP.  ECF No. 438 at 4 ¶ 12.  Nurse Brun contacted Ms. Torres through a Spanish-speaking staff member.[3]  ECF No. 438 at 3 ¶ 9; ECF No. 510 at 17 ¶ 9.  Nurse Brun explains in a declaration that Ms. Torres said to use the inhaler at 11:00 a.m. and at 2:00 p.m.  ECF No. 439 at 3 ¶ 5.  Ms. Torres testified in deposition that she said 10:00 a.m. and 2:00 p.m.  ECF No. 447-1 at 10.

Nurse Brun avers in a declaration that she was not aware of Fix-Lanes's note before September 14, 2017.  ECF No. 439 at 8 ¶¶ 20-21.  However, there are copies of Fix-Lanes's note that are marked as "Received 9-7-17."  ECF No. 447-24 at 3-5.  Nurse Brun initially denied this was in her handwriting but has since submitted a declaration claiming, rather, that she does not remember receiving the doctor's note or writing on it, prior to September 14, 2017.  ECF No. 519 at 7-8 ¶¶ 43-44.  A handwriting expert has opined that the handwriting on Fix-Lanes's note

---

[3] The Spanish-speaking staff member, Geraldo Sandoval, testified he could not recall this interaction with any detail.  ECF No. 398-3 at 3-5.  Ms. Torres and Nurse Brun each confirmed the exchange.  ECF No. 447-1 at 10; ECF No. 278-2 at 5-6.

ORDER - 5

1  is Nurse Brun's.  ECF No. 439 at 9 ¶ 25.  KSD does not dispute that the

2  handwriting is Nurse Brun's.  ECF No. 519 at 8 ¶ 45.

3        At 8:31 a.m. on September 7, Nurse Brun emailed a group of Torres's

4  teachers to inform them that he "was just diagnosed with a life threatening

5  condition of asthma."  ECF No. 447-15 at 2.  Nurse Brun advised that she had an

6  inhaler in the nurse's office, that Ms. Torres directed it be used at 11:00 a.m. and

7  2:00 p.m., and asked the other teachers to keep an eye on Torres.  ECF No. 447-15

8  at 2.  The email was not sent to Torres's physical education teacher, Kara

9  Beauchamp.  ECF No. 447-15 at 2; ECF No. 278-2 at 7; ECF No. 438 at 5 ¶ 18;

10  ECF No. 510 at 18-19 ¶¶ 17-18.  Nurse Brun states that around the same time, she

11  put an alert in "PowerSchool," a software that KSD staff use, to notify staff of

12  Torres's asthma.  ECF No. 439 at 4-5 ¶ 12; ECF No. 439-3.

13        Physical education began at 12:03 p.m.[4]  ECF No. 438 at 5 ¶ 20; ECF No.

14  510 at 19 ¶ 20.  Beauchamp had Torres run for approximately two minutes.  ECF

15  No. 438 at 5 ¶ 20; ECF No. 510 at 19 ¶ 20; ECF No. 490 (not disputing ECF No.

16

17  ──────────────
    [4] There is a dispute of fact as to whether Torres visited Nurse Brun at 11:30 a.m.

18  For context of the dispute, *see* ECF No. 533 (Order on Estate's Rule 37 Motion for

19  Default); *see also* ECF No. 429-7 at 3; ECF No. 429-10 at 2-4; ECF No. 429-16 at

20  2; ECF No. 429-17 at 2.

ORDER - 6

446 at 6 ¶ 24).[5]   After running, Torres asked Beauchamp to use his inhaler.  ECF No. 438 at 5 ¶ 21; ECF No. 510 at 19 ¶ 21; ECF No. 447-16 at 2; ECF No. 519 at 7 ¶¶ 40-41.  Beauchamp sent Torres to the nurse's office accompanied by another student.  ECF No. 438 at 5 ¶ 22; ECF No. 510 at 20 ¶ 22; ECF No. 519 at 7 ¶ 40.

At 12:30 p.m., Nurse Brun gave Torres his inhaler.[6]   ECF No. 438 at 5 ¶ 23; ECF No. 510 at 20 ¶ 23; ECF No. 447-32; ECF No. 519 at 8 ¶ 46.  The interaction lasted less than two minutes.  ECF No. 447-32.   Torres returned to gym class and performed "sit and reach" testing.  ECF No. 438 at 6 ¶ 25; ECF No. 510 at 20 ¶ 25; ECF No. 274 at 2 ¶ 6.

Torres returned to the nurse's office around 2:00 p.m. to use his inhaler again and took one puff.  ECF No. 438 at 6 ¶ 26; ECF No. 510 at 21 ¶ 26; ECF No. 439-4 at 2.  This interaction lasted about a minute.  ECF No. 447-42; ECF No. 459.

---

[5] The Estate disputes the amount of time that Torres ran and the extent of his exercise.  ECF No. 510 at 19 ¶ 20.  For context of the dispute, *see* ECF No. 533; 510 at 19 ¶ 20; ECF No. 447-22 at 2-10; ECF No. 459 (Non-scannable school video exhibits); ECF No. 274 at 2 ¶ 3; ECF No. 447-16 at 2.

[6] The Estate disputes whether Torres took two puffs or one puff of his inhaler, arguing that video evidence shows insufficient time for two puffs.  ECF No. 510 at 20 ¶ 23.

ORDER - 7

School let out at 2:35 p.m. and Torres's parents picked him up at approximately 2:43 p.m.  ECF No. 519 at 8 ¶ 53.  Torres experienced a severe asthma attack, and his family called an ambulance to take him to the hospital.  *See* ECF No. 421 at 3-6.  He spent 18 days in the hospital and passed away on September 25, 2017.  ECF No. 519 at 9 ¶ 56; *see* ECF No. 421 at 4.

On March 13, 2019, the Estate filed a Complaint against KSD and Nurse Brun, alleging that their conduct resulted in Torres's death.  ECF No. 1.  On December 19, 2019, the Estate filed a First Amended Complaint, ECF Nos. 41, 42, and on May 24, 2021, the Estate filed a Second Amended Complaint, ECF No. 117, each of which added additional defendants to the case.  The Court dismissed the Estate's claims against all defendants other than KSD and Nurse Brun on summary judgment.  *See* ECF Nos. 86, 421.[7]

## LEGAL STANDARD

A party may move for summary judgment on part of a claim or defense. Fed. R. Civ. P. 56(a).  A district court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  *Id.*; *see also Celotex Corp. v.*

---

[7] Additional factual and procedural history is found in the Court's Order at ECF No. 421.

ORDER - 8

*Catrett*, 477 U.S. 317, 322-23 (1986); *Barnes v. Chase Home Fin., LLC*, 934 F.3d 901, 906 (9th Cir. 2019).  "A fact is 'material' only if it might affect the outcome of the case, and a dispute is 'genuine' only if a reasonable trier of fact could resolve the issue in the non-movant's favor." *Fresno Motors, LLC v. Mercedes Benz USA, LLC*, 771 F.3d 1119, 1125 (9th Cir. 2014) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  The court "must view the evidence in the light most favorable to the nonmoving party and draw all reasonable inference in the nonmoving party's favor." *Rookaird v. BNSF Ry. Co.*, 908 F.3d 451, 459 (9th Cir. 2018).

The moving party bears the initial burden of informing the district court of the basis for its motion and identifying the portions of the record and the evidence that demonstrate the absence of a genuine dispute of material fact. *Celotex*, 477 U.S. at 323 (quoting former Fed. R. Civ. P. 56(c)).  After the moving party has satisfied its burden, to survive summary judgment, the non-moving party must demonstrate with evidence on the record "specific facts" showing that there is a genuine dispute of material fact for trial. *Id.* at 324.  "The mere existence of a scintilla of evidence in support of the [movant's] position will be insufficient[.]" *Anderson*, 477 U.S. at 252.

The court "must view the evidence in the light most favorable to the nonmoving party and draw all reasonable inference in the nonmoving party's

1   favor." *Rookaird*, 908 F.3d at 459.  "Credibility determinations, the weighing of

2   the evidence, and the drawing of legitimate inferences from the facts are jury

3   functions, not those of a judge . . . ."  *Anderson*, 477 U.S. at 255.

4       "[W]hen parties submit cross-motions for summary judgment, [e]ach motion

5   must be considered on its own merits," but the court must consider all evidence

6   submitted in support of both cross-motions when separately reviewing the merits

7   of each motion.  *Fair Hous. Council of Riverside Cnty., Inc. v. Riverside Two*, 249

8   F.3d 1132, 1136 (9th Cir. 2001) (second alteration in original).

9                                      **DISCUSSION**

10      Defendants move for summary judgment on the Estate's federal causes of

11  action.  ECF No. 270 at 2-3.  The Estate moves for summary judgment on the

12  question of Defendants' liability under Section 1983, the ADA, and Section 504.

13  ECF No. 445 at 2.  The Court considers the Estate's federal claims against each

14  defendant separately.

15  **A. Section 1983**

16      Section 1983 provides, in relevant part, that

17          [e]very person who, under color of any statute, ordinance,
           regulation, custom, or usage, of any State . . . , subjects, or
18          causes to be subjected, any citizen of the United States . .
           . to the deprivation of any rights, privileges, or immunities
19          secured by the Constitution and laws, shall be liable to the
           party injured in an action at law, suit in equity, or other
20          proper proceeding for redress . . . .

42 U.S.C. § 1983.  "[Section] 1983 is not itself a source of substantive rights, but merely provides a method for vindicating federal rights elsewhere conferred." *Graham v. Connor*, 490 U.S. 386, 393-94 (1989) (citation and quotation marks omitted).  To state a claim under Section 1983, a plaintiff must show that he was "deprived of a right secured by the Constitution or laws of the United States, and that the alleged deprivation was committed under color of state law." *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 49-50 (1999).

The Due Process Clause of the Fourteenth Amendment provides that "[n]o State shall . . . deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1; *Murguia v. Langdon*, 61 F.4th 1096, 1106 (9th Cir. 2023).  "The Due Process Clause does not 'impose an affirmative obligation on the State' to protect a person's life, liberty, or property; it acts as a 'limitation on the State's power to act' rather than a 'guarantee of certain minimal levels of safety and security.'" *Polanco v. Diaz*, 76 F.4th 918, 925-26 (9th Cir. 2023) (quoting *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 195 (1989)).  "The 'general rule,' then, is that 'a state actor is not liable under the Due Process Clause 'for its omissions.'" *Id.* (quoting *Pauluk v. Savage*, 836 F.3d 1117, 1122 (9th Cir. 2016)).

There are two exceptions to the general rule: the "special relationship exception," which is "when a 'special relationship' exists between the plaintiff and

the state[,]" and the "state-created danger exception[,]," which is "when the state affirmatively places the plaintiff in danger by acting with 'deliberate indifference' to a 'known or obvious danger.'" *Patel v. Kent Sch. Dist.*, 648 F.3d 965, 971-72 (9th Cir. 2011) (quoting *Deshaney*, 489 U.S. at 198-202; *L.W. v. Grubbs*, 92 F.3d 894, 900 (9th Cir. 1996)).

The Estate alleges that Nurse Brun and KSD deprived Torres[8] of "his protected life and liberty interest[.]" ECF No. 117 at 26 ¶ 7.3. The Estate's Section 1983 claims are "rooted in the substantive component of the Due Process Clause.[9] *See Murguia*, 61 F.4th at 1106.

---

[8] The Estate suggests that Torres's parents' Fourteenth Amendment rights were violated. ECF No. 445 at 28-29. However, the Estate did not plead such a claim. *See* ECF No. 117.

[9] The Estate's Second Amended Complaint suggests that Torres's right to a public education is implicated in his Section 1983 cause of action. ECF No. 117 at 27-28 ¶ 7.8. Violations of the ADA or Section 504 are not redressable through Section 1983 because Congress intended such violations be redressed through the causes of action created by those statutes. *See Okwu v. McKim*, 682 F.3d 841, 845-46 (9th Cir. 2012) ("By drafting a comprehensive remedial scheme for employer's violations of ADA Title I, Congress manifested an intent to preclude [Section]

ORDER - 12

1     *1. Nurse Brun*

2        The parties do not dispute that Nurse Brun acted under color of state law

3   while performing the duties of a school nurse for KSD.  *See* ECF No. 270; ECF

4   No. 445 at 31-32; ECF No. 489 at 19.  The parties each argue for summary

5   judgment in their favor on the question of whether Nurse Brun violated the Due

6   Process Clause in the performance of her duties pursuant to the special relationship

7   exception and the state-created danger exception.  ECF No. 270 at 10-16; ECF No.

8   445 at 31-34; ECF No. 512 at 9-14; ECF No. 516 at 7-8.

9        a.  Special Relationship Exception

10        The special relationship exception "applies when a state 'takes a person into

11  its custody and holds him there against his will.'"  *Patel*, 648 F.3d at 972 (quoting

12  *DeShaney*, 489 U.S. at 199-200).  When the state holds a person in custody, the

13  Due Process Clause requires that it bear "some responsibility for the person's

14  safety and well-being."  *Id.* (citation omitted).

15

16

---

17  1983 remedies."); *Vinson v. Thomas*, 288 F.3d 1145, 1156 (9th Cir. 2002) ("[A]

18  plaintiff cannot bring an action under 42 U.S.C. § 1983 against a State official in

19  her individual capacity to vindicate rights created by Title II of the ADA or section

20  504 of the Rehabilitation Act.").

ORDER - 13

The Ninth Circuit's decision in *Patel* is controlling here.  648 F.3d at 972-74.  In *Patel*, a school placed a high school student with developmental disabilities under an individualized education plan, which plan aimed to prevent sexual contact with other students.  648 F.3d at 969.  The special education teacher tasked with monitoring the student permitted the student to use the restroom unsupervised.  *Id.* at 969.  The student had repeated sexual contact with a male student when visiting the restroom.  *Id.*  The student's mother filed suit, alleging a violation of the Due Process Clause pursuant to the special relationship and state-created danger exceptions.  *Id.* at 970-71.  The Ninth Circuit affirmed the grant of summary judgment and declined to find a special relationship between the student and the teacher.  *Id.* at 972-74.  The court specifically rejected many of the arguments that the Estate now advances.  *See id.* at 972-74.

The Estate cites to "[t]he doctrine of *in loco parentis*" to suggest a special relationship existed between Nurse Brun and Torres.  ECF No. 445 at 29 (citations omitted).  The *Patel* court disagreed with the same assertion, because "unlike incarceration or institutionalization, compulsory school attendance does not restrict a student's liberty such that neither the student nor the parents can attend to the student's basic needs."  *Patel*, 648 F.3d at 973 (citation omitted).  "[R]equiring school attendance does not sufficiently restrict a student's liberty . . . to transform the school's *in loco parentis* duties into a constitutional obligation."  *Id.* (citation

ORDER - 14

omitted).  Moreover, the Ninth Circuit has declined to find that "the failure to comply with a legally required duty, without more, can give rise to a substantive due process claim" and noted the lack of authority supporting the contention. *Murguia*, 61 F.4th at 1108-10, 1108 n.9.

The Estate argues that "[e]xpress assurances" give rise to a special relationship and that Nurse Brun "had taken control" of Torres's healthcare.  ECF No. 445 at 30; ECF No. 512 at 13.  The *Patel* court explained that the school's "agreement to provide enhanced supervision did not prevent [the mother] from caring for [the student's] basic needs" and therefore could not establish a special relationship.  648 F.3d at 974.  Moreover, the state must do more than assume responsibility for a child's care, it must exclude parents from that care.  In *Murguia*, for example, the Ninth Circuit declined to find a special relationship between state officials and infant twins, where the parents had been temporarily physically separated from the twins.  61 F.4th at 1110.  Although physically separated, the parents in *Murguia* "retained long-term responsibility for the care of the twins, as well as long-term control over decisions regarding the twins." *Id.* Therefore, no special relationship existed. *Id.*

The Estate highlights that Torres "was a special education student with a medical accommodation for asthma[,]" suggesting that his medical condition and particular needs gave rise to "a heightened duty of care" that Nurse Brun breached.

ORDER - 15

1  ECF No. 445 at 30-31.  As the *Patel* court explained, "[a] tailored educational

2  program for a disabled student does not meet th[e] threshold" of the special

3  relationship exception.  648 F.3d at 974.  A school's failure to follow a plan may

4  "undermine[]" a parent's ability to care for their child's needs and may support a

5  state-law negligence claim, but it is legally insufficient for a constitutional claim.

6  *See id.*

7        The Estate argues that Torres's access to basic healthcare was restrained at

8  school, creating a special relationship.  ECF No. 512 at 12.  The Estate does not

9  identify authority suggesting assumption of medical care at school creates a special

10  relationship.[10]  "The types of custody triggering the [special relationship] exception

11

12  [10] A review of post-*Patel* case law suggests that district courts are hesitant to find

13  that a public school system establishes a "special relationship" between the state

14  and students.  *See, e.g.*, *Davis v. Wash. State Dep't of Soc. & Health Servs.*, No.

15  17-CV-62, 2017 WL 2525299, at *3 n.3 (E.D. Wash. June 9, 2017); *J.J. v.*

16  *Olympia Sch. Dist.*, No. C16-5060, 2017 WL 347397, at *8-9 (W.D. Wash. Jan.

17  24, 2017); *Dodson v. Cartwright Elem. Sch. Dist.*, No. CV-15-674, 2016 WL

18  3437602, at *3 (D. Ariz. Mar. 25, 2016).  For comparison, such relationships have

19  been found in the foster care system.  *See Henry A. v. Willden*, 678 F.3d 991, 1000

20  (9th Cir. 2012) (finding it "clearly established that this special relationship doctrine

ORDER - 16

are 'incarceration, institutionalization, or other similar restraint of personal liberty.'" *Patel*, 648 F.3d at 972 (quoting *DeShaney*, 489 U.S. at 200). It is not genuinely disputed that Torres went to school during the day, lived at home, and his parents retained long-term responsibility for and had long-term control over his basic care. There is no special relationship on this record as a matter of undisputed fact and law.

Defendants' motion for summary judgment on the Estate's special relationship exception theory of liability against Nurse Brun is granted.

### b. State-Created Danger Exception

The state-created danger exception has two requirements.[11] *Id.* at 974. First, it applies only where "there is 'affirmative conduct on the part of the state in placing the plaintiff in danger.'" *Id.* (quoting *Munger v. City of Glasgow Police*

_____

applies to children in foster care").

[11] In some recent cases, the Ninth Circuit includes a "foreseeability" requirement, which requires that the ultimate injury was foreseeable given the circumstances. *Sinclair v. City of Seattle*, 61 F.4th 674, 680 (9th Cir. 2023); *Martinez v. City of Clovis*, 943 F.3d 1260, 1273-74 (9th Cir. 2019); *Hernandez v. City of San Jose*, 897 F.3d 1125, 1133 (9th Cir. 2018). The Court grants summary judgment on other grounds and thus need not address foreseeability.

ORDER - 17

*Dep't*, 227 F.3d 1082, 1086 (9th Cir. 2000)).  Second, it only applies when "the state acts with 'deliberate indifference' to a 'known or obvious danger.'" *Id.* (quoting *Grubbs*, 92 F.3d at 900).  The parties dispute each element.  ECF No. 270 at 11, 16; ECF No. 445 at 34.  The Estate argues for summary judgment in part on the first, ECF No. 445 at 32-34, and Defendants seeks summary judgment on both, ECF No. 270 at 10-18.

               i.   Affirmative conduct placing plaintiff in danger

"To satisfy the first requirement, a plaintiff 'must show that the officers' affirmative actions[12] created or exposed [him] to an actual, particularized danger that [he] would not otherwise have faced." *Murguia*, 61 F.4th at 1111 (quoting *Martinez*, 493 F.3d at 1271) (alterations in original).  In other words, a state actor

---

[12] The Estate argues that omissions may give rise to liability under the state created danger exception, citing to a broader standard applied to Section 1983 claims in contexts outside of the Fourteenth Amendment.  ECF No. 445 at 33 (citing *Hicks v. Dotson*, 73 F. Supp. 3d 1296, 1300 (E.D. Wash. 2014)).  In contrast, to violate the Due Process Clause by creating a danger, a state actor must have "affirmatively acted"—an "omission" amounts to leaving the plaintiff in the same position they would have been in, absent the state actor's conduct.  *Martinez*, 943 F.3d at 1272-73.

ORDER - 18

must have left the plaintiff "in a situation that is more dangerous than the one in which they found [him]." *Maxwell v. Cnty. of San Diego*, 708 F.3d 1075, 1082 (9th Cir. 2013) (citing *Munger*, 227 F.3d at 1086). "Impeding access to medical care amounts to leaving a victim in a more dangerous situation." *Id.* (citing *Penilla v. City of Huntington Park*, 115 F.3d 707, 710 (9th Cir. 1997)).

The record contains sufficient evidence to infer that Nurse Brun placed Torres in danger. First, Nurse Brun may have given incorrect medical advice, by "remind[ing] [Torres] that his mother wanted him to use his inhaler at 11:00 a.m. and 2:00 p.m. and that he should come to [her] office at those times." ECF No. 439 at 6 ¶ 15. These times are inconsistent with the IHP's instruction that Torres receive medication every four hours. ECF No. 447-25 at 2. "[P]ositive remarks" may constitute affirmative acts creating or increasing danger. *See Martinez*, 943 F.3d at 1273. On the current record, it is a reasonable inference that the advice was medically unsafe and may be bolstered by medical testimony.

Second, Nurse Brun may have incorrectly administered Torres's medication. At 12:30 p.m., she allowed Torres to take two puffs. ECF No. 439 at 7 ¶ 18; ECF No. 278-2 at 11. At 2:00 p.m., Torres returned and took one puff. ECF No. 439 at 7 ¶ 19. A reasonable fact finder could conclude that Nurse Brun increased the danger presented by Torres's asthma by administering Torres his medication in a manner inconsistent with doctor's orders.

ORDER - 19

1    Defendants dispute that Nurse Brun's affirmative acts created the danger

2  Torres faced.  ECF No. 489 at 11-12.  The Court is in no position at summary

3  judgment to resolve factual disputes over the causal factors of Torres's asthma

4  attack.  *See Anderson*, 477 U.S. at 255.  There are many medical experts present in

5  this litigation with differing views of the evidence.  *See, e.g.*, ECF No. 490 at 18-

6  19, 29; ECF Nos. 453-9, 453-14, 453-25.  A genuine dispute of fact precludes

7  summary judgment on the question of whether Nurse Brun's affirmative acts

8  subjected Torres to danger that he otherwise would not have faced.

9    ii.  Deliberate indifference to a known and obvious danger

10    Deliberate indifference, in the state-created danger context,[13] "is 'a stringent

11  standard of fault, requiring proof that a municipal actor disregarded a known or

12  obvious consequence of his action.'"  *Martinez*, 943 F.3d at 1274 (quoting *Patel*,

13  648 F.3d at 974).  "When assessing non-detainee failure-to-protect claims, [the

14  court is to] apply a purely subjective deliberate indifference test."  *Murguia*, 61

15  F.4th at 1111 (citing *Herrera v. Los Angeles Unified Sch. Dist.*, 18 F.4th 1156,

16  1161 (9th Cir. 2021)).  "This standard is higher than gross negligence and requires

17

18  [13] As noted below, there are several distinct "deliberate indifference" tests relevant

19  to the instant motions.  *See Polanco*, 76 F.4th at 928 n.7 (citations omitted)

20  (discussing different "deliberate indifference" tests.").

ORDER - 20

a culpable mental state." *Id.* (citing *Patel*, 648 F.3d at 974).  The state actor "must

know that something is going to happen but ignore the risk and expose the plaintiff

to it." *Id.* (citation, quotation marks, and alterations omitted).  "The deliberate-

indifference inquiry should go to the jury if any rational fact finder could find this

requisite mental state." *Id.* (quoting *Patel*, 648 F.3d at 974).

      The Estate does not seek summary judgment on the question of Nurse

Brun's deliberate indifference.  ECF No. 512 at 10.  Defendants do, and argue the

record lacks any evidence to support a finding that Nurse Brun "recognized an

unreasonable risk" and "intended to expose" Torres to danger.  ECF No. 489 at 15.

The Estate addressed "deliberate indifference" in its reply brief, albeit under a

different standard than is applied to state created danger claims.  *See* ECF No. 512

at 4 (citing *Duvall v. Cnty. of Kitsap*, 260 F.3d 1124, 1139 (9th Cir. 2001)

(deliberate indifference in the context of intentional discrimination in ADA and

Section 504 claims)).

      The Estate emphasizes that Nurse Brun knew Torres had life-threatening

asthma.  ECF No. 512 at 10-11.  Her knowledge, alone, is insufficient; the relevant

"danger" that she disregarded must be "state-created." *See Murguia*, 61 F.4th at

1111-12.  The Due Process Clause does not compel Nurse Brun into action simply

because she is aware of danger; it compels her to act to protect Torres only from

dangers that she creates. *See id.* at 1110-11.

ORDER - 21

1    The Estate highlights the things that Nurse Brun did not do for Torres.  ECF

2    No. 512 at 6-10.  The Estate argues that "she recognized the consequences of

3    medical neglect could endanger [Torres] and that it would be reckless to do so.  . . .

4    [Nurse] Brun, having this knowledge, miserably failed to do her job as a nurse."

5    ECF No. 512 at 6.  Medical neglect and failing to do one's job is insufficient to

6    support deliberate indifference.

7        No reasonable fact finder could conclude from the record presented that

8    Nurse Brun "kn[e]w that something [wa]s going to happen but ignore[d] the risk

9    and expose[d] [Torres] to it."  *See Murguia*, 61 F.4th at 1111.  There is no

10   evidence from which a reasonable fact finder could determine that Nurse Brun had

11   a "culpable mental state."  *See Patel*, 648 F.3d at 974.  At most, and viewed in the

12   light most favorable to the Estate, the record indicates medical negligence, which,

13   as a matter of law, "is not enough for deliberate indifference."  *See id.* at 976.

14       The Ninth Circuit has affirmed summary judgment on similar records.  For

15   example, in *Patel*, plaintiff argued for application of the state-created danger

16   exception (in addition to the special relationship exception, discussed above).  *Id.*

17   at 974.  The Ninth Circuit found that the record lacked evidence supporting a

18   finding that the teacher was deliberately indifferent.  *Id.* at 976.  The Ninth Circuit

19   observed that the teacher "did not act in a manner contrary to assisting someone in

20   a known, immediate danger."  *Id.* at 975.  More specifically, the teacher

ORDER - 22

1
2
3
4
5
6

> regularly communicated about [the student] with school officials, other teachers, and [the student's mother; asked another teacher to help her monitor the possible developing relationship between [the student and a male student; spoke separately with the two students about their hugging in the hallway[;rushed out of her classroom to prevent an incident between them as soon as she realized they were both gone at the same time[; and] gave her colleagues a compelling reason for allowing [the student] to use the bathroom by herself[.]

7
8
9

*Id.* at 976.  The Ninth Circuit explained that "[t]aken together, this evidence does not suggest that [the teacher] harbored the requisite mental state of intentionally or knowingly subjecting [the student] to a known or obvious danger" and that "[a]t worst, [the teacher] committed a lapse in judgment[.]" *Id.*

10
11
12
13
14
15

Here, there is no dispute that Nurse Brun contacted Torres's mother upon finding Torres's medical documents and spoke through an interpreter to acquire more information.  ECF No. 438 at 3 ¶¶ 8-9; ECF No. 510 at 17 ¶¶ 8-9.  Nurse Brun told Torres to use his inhaler, told Torres's teachers about his asthma both in an email and on PowerSchool,[14] and gave him medication when he asked for it.

16
17
18
19
20

---

[14] The Estate disputes the authenticity of the PowerSchool Alert because "KSD has been unable to produce a timestamp for the PowerSchool Alert, and has been unable to produce other PowerSchool alerts that its employees testify used to exist."  ECF No. 510 at 19 ¶ 19.  KSD presents declarations from individuals who can authenticate the alert, and who made the alert.  ECF No. 439 at 6 ¶ 16; ECF

ORDER - 23

ECF No. 438 at 5 ¶ 23, 6 ¶ 26; ECF No. 439 at 4-8 ¶¶ 12-19; ECF No. 439-3 at 2; ECF No. 439-4 at 2; ECF No. 447-15 at 2; ECF No. 447-32; ECF No. 510 at 20 ¶ 23, 21 ¶ 26; ECF No. 519 at 8 ¶ 46.  In other words, the undisputed record demonstrates that Nurse Brun acted in a manner consistent with assisting a student with a medical issue.  *See Patel*, 648 F.3d at 975.

In *Patel*, the teacher knew about the student's dangerous condition, but "did not know about any immediate risk."  *Id.* at 975-76.  Similar to the *Patel* teacher, Nurse Brun knew Torres had a dangerous condition, and that there are protocols in place to deal with the condition, but there is no evidence indicating that she knew that her actions presented any immediate risk to Torres.  *See Patel*, 648 F.3d at 975-76.  But, as was true in *Patel*, her failure to adhere to those protocols does not amount to deliberate indifference.  *See id.* at 976.  If her care was insufficient, such a finding might support negligence or gross negligence, but cannot establish deliberate indifference.  *See id.*

Similarly, in *Herrera*, the Ninth Circuit affirmed summary judgment in favor of a school aide because the plaintiff could not establish deliberate indifference.  18 F.4th at 1161-64.  The aide was monitoring a student with autism

---

No. 273 at 3-4 ¶¶ 7-13.  The Estate's distrust of the evidence does not create a genuine dispute.

ORDER - 24

who could not swim, attending a pool party. *Id.* at 1158. The student drowned when the aide walked away for a moment. *Id.* The Ninth Circuit explained that "[i]n evaluating deliberate indifference, circumstances are vital in contextualizing a defendant's decisions." *Id.* at 1163. The aide did not exhibit deliberate indifference because he did not leave the student "completely without protection;" there were lifeguards monitoring the pool. *Id.* at 1163-64. Similarly, here, Nurse Brun informed Torres's teachers of his condition. ECF No. 439 at 4-5 ¶¶ 12-13; ECF No. 447-15 at 2; ECF No. 439-3 at 2. It may be true that Nurse Brun should have informed the physical education teacher more directly, however, the Estate presents no genuine dispute that the failure was more than a mistake. ECF No. 439 at 6 ¶ 14.

Nurse Brun may have made mistakes, perhaps amounting to negligence. The Due Process Clause does not provide a remedy for negligence.[15] The Estate

---

[15] For examples of circumstances amounting to an inference of deliberate indifference, *see, e.g.*, *Polanco*, 76 F.4th at 927-29 (prison officials created a risk of COVID-19, ignored guidance, and exposed a prison guard to COVID-19); *Hernandez*, 897 F.3d at 1136-37 (officers witnessed a violent crowd and directed plaintiffs into that violent crowd); *Kennedy v. City of Ridgefield*, 439 F.3d 1055, 1062-65 (9th Cir. 2006) (officers responded to a call about a violent neighbor and

seeks to enforce a supposedly constitutional duty to "adhere to the doctor's orders, the IHP, and the state guidelines." ECF No. 445 at 34. There is no such duty under the constitution.

Defendants' motion for summary judgment as to the Estate's Section 1983 claim against Nurse Brun is granted.

c.  Qualified Immunity

"Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Martinez*, 943 F.3d at 1275 (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)) (quotation marks omitted). "To determine whether an officer is entitled to qualified immunity, the Court asks, in the order it chooses, (1) whether the alleged misconduct violated a constitutional right and (2) whether the right was clearly established at the time of the alleged misconduct." *Hernandez*, 897 F.3d at 1132 (quoting *Maxwell*, 708 F.3d at 1082) (alterations and quotation marks omitted). The Supreme Court has explained that

_____

informed the neighbor's family, the neighbor then shot the callers); *Penilla*, 115 F.3d at 708-09 (officers canceled an ill individual's ambulance, dragged him inside his house, locked the door, and left).

ORDER - 26

"[t]he 'clearly established' standard also requires that the legal principle clearly prohibit the officer's conduct in the particular circumstances before him.  The rule's contours must be so well defined that it is 'clear to a reasonable officer that his conduct was unlawful in the situation he confronted.'"  *District of Columbia v. Wesby*, 583 U.S. 48, 63 (2018).  When this test is properly applied, it protects "all but the plainly incompetent or those who knowingly violate the law."  *Hernandez*, 897 F.3d at 1132-33 (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011)) (quotation marks omitted).

The Ninth Circuit's analysis in *Polanco* is instructive.  76 F.4th at 929-31.  There, plaintiffs alleged that prison officials transferred prisoners during the COVID-19 pandemic, which resulted in the death of a guard.  *Id.* at 923.  The court found that the application of the state-created danger doctrine to the facts of that case was clearly established by two prior cases, *Grubbs*, 974 F.2d 119, and *Pauluk*, 836 F.3d 1117.  *Id.* at 930.  Collectively, *Grubbs* and *Pauluk* "put public officials on notice that they may be liable under the state-created danger doctrine" in the following circumstances:

> (1) the harmed party is their employee (*Grubbs* and *Pauluk*);
> (2) the harmed party encountered the relevant danger in the course of carrying out employment duties in a correctional facility (*Grubbs*);
> (3) the danger was created by requiring the employee to work in close proximity to people who posed a risk (*Grubbs*);

ORDER - 27

> (4) the physical conditions of the workplace contributed to the danger (*Pauluk*); and
> (5) the danger was a potentially fatal illness caused by breathing contaminated air (*Pauluk*).

*Id.* at 931. The court concluded that "COVID-19 may have been unprecedented, but the legal theory that Plaintiffs assert is not." *Id.*

The Estate has not identified, and the Court has not found, precedent to put Nurse Brun on notice that she might be held liable under the state-created danger doctrine as a school nurse for failing to provide medical care. As the Southern District of California observed, there is "no clear authority extending the state created danger doctrine to situations where a state official failed to provide necessary care . . . , as opposed to affirmatively exposing the child to a third-party danger." *Shane v. Cnty. of San Diego*, No. 22-cv-1309-JO-AGS, 2023 WL 4055706, at *7 (S.D. Cal. June 16, 2023). *Shane* was decided in 2023, well after the events of this case. *Id.*

*Patel* appears to be the most relevant Ninth Circuit case predating the events underlying this case, and the *Patel* court declined to find a violation of the Fourteenth Amendment. 648 F.3d at 976. A court should grant qualified immunity where a higher court "declined to find a due process violation in a case with very similar facts," because the court "cannot say that [the defendants] were 'on notice' that their conduct was unlawful under clearly established law." *Pauluk*, 836 F.3d at 1126.

ORDER - 28

1    The Estate identifies only general principles regarding the Due Process

2    Clause from tangentially related doctrine or nonbinding case law.  ECF No. 512 at

3    20-21 (citing *Kennedy*, 439 F.3d at 1061; *Goss v. Lopez*, 419 U.S. 565, 576 (1975);

4    *Moss v. Shelby Cnty.*, 401 F. Supp. 2d 850 (W.D. Tenn. 2005)).  Nurse Brun "may

5    not be held liable under a doctrine that is "defined at a high level of generality[.]"

6    *Martinez*, 943 F.3d at 1275 (citing *White v. Pauly*, 580 U.S. 73, 79 (2017)).

7        The Court grants summary judgment as to the Estate's Section 1983 claim

8    against Nurse Brun for lack of an underlying constitutional violation, and because

9    Nurse Brun is entitled to qualified immunity for the violation as alleged.

10    *2.  KSD*

11        The parties each move for summary judgment as to the Estate's Section

12    1983 claims against KSD.  ECF No. 270 at 18-20; ECF No. 445 at 28.  The Estate

13    argues that KSD violated Torres's rights by "acting through its nurse."  ECF No.

14    445 at 32, 34.  Defendants argue that there is no evidence supporting a legally

15    viable Section 1983 claim against KSD.  ECF No. 270 at 18-20.

16        "A municipality or other local government may be liable under [Section

17    1983] if the governmental body itself 'subjects' a person to a deprivation of rights

18    or 'causes' a person 'to be subjected' to such deprivation."  *Connick v. Thompson*,

19    563 U.S. 51, 60 (2011) (quoting *Monell*, 436 U.S. at 692).  Municipalities may not

20    be held "vicariously liable" or liable under a theory of "respondeat superior" for

the acts of their employees.  *Id.*; *see also Castro v. Cnty. of Los Angeles*, 833 F.3d 1060, 1073 (9th Cir. 2016).  A *Monell* plaintiff must demonstrate that "an official policy, custom, or pattern" on the part of the municipal defendant "was the actionable cause of the claimed injury."  *Tsao v. Desert Palace, Inc.*, 698 F.3d 1128, 1143 (9th Cir. 2012) (citation and quotation marks omitted).  The custom or policy must be a "deliberate choice to follow a course of action."  *Castro*, 833 F.3d at 1075 (quoting *Pembaur v. City of Cincinnati*, 475 U.S. 469, 483 (1986)).

There are three ways to establish a "policy" sufficient to hold an entity defendant liable under *Monell*.  *Gordon v. Cnty. of Orange*, 6 F.4th 961, 973 (9th Cir. 2021).  First, where the entity "acts pursuant to an expressly adopted official policy."  *Id.* (citing *Thomas v. Cnty. of Riverside*, 763 F.3d 1167, 1170 (9th Cir. 2014)).  Second, where a "longstanding practice or custom" causes a constitutional injury, including where the defendant "fails to implement procedural safeguards to prevent constitutional violations or, sometimes, when it fails to train its employees adequately."  *Id.* (citing *Thomas*, 763 F.3d at 1170; *Tsao*, 698 F.3d at 1143) (alterations and quotation marks omitted).  Third, where the constitutional tortfeasor is an official with final law-making authority or where that official ratified a subordinates' unconstitutional act.  *Id.* (citation omitted).  There must be a "direct causal link" between the relevant policy and the constitutional injury at

1    issue.  *Sandoval v. Cnty. of San Diego*, 985 F.3d 657, 681 (9th Cir. 2021) (citing

2    *Castro*, 833 F.3d at 1075).

3          The Court considers the viability of the Estate's claims against KSD

4    directly, any relief sought against KSD "through its nurse" is summarily denied.

5    ECF No. 445 at 32.  The Estate offers a number of unrelated KSD "policies" that it

6    contends caused Torres's constitutional injury.  ECF No. 512 at 15-20.

7                  a.  Lack of Equipment and Inadequate Equipment

8          The Estate argues that KSD had policies of using inadequate equipment.

9    ECF No. 512 at 16-19.  First, the Estate contends that KSD failed to ensure that the

10   nurse's office had an oximeter.  ECF No. 512 at 16-17.  KSD, through a Fed. R.

11   Civ. P. 30(b)(6) deponent, testified that it recommends its schools have oximeters

12   in the nurses' offices.  ECF No. 488-4 at 11-13.  The Estate highlights that KSD

13   has been unable to provide documentation that it purchased oximeters.  ECF

14   No. 446 at 22 ¶ 113.  Nurse Brun did not use an oximeter when Torres came to her

15   office on September 7, 2017.  ECF No. 519 at 8 ¶ 52.

16          Second, the Estate argues that KSD has inadequate air filtration in its

17   buildings to contend with wildfire smoke.  ECF No. 512 at 19.  KSD officials were

18   aware that air quality on September 7, 2017, was hazardous.  ECF No. 447-11 at 5.

19   The Estate provides a 2018 user's guide from the National Air Filtration

20   Association that explains that a "MERV Std 52.2" with a rating of "13-16" is

required for "smoke removal."  ECF No. 445 at 13 (citing ECF No. 447-17).  Keith

Colee, who appears to be responsible for managing KSD's air filtration, testified

that he looked into obtaining better filters but could not obtain them on a rush

order.  ECF No. 447-18 at 4-5.  In addition to their allegedly inadequacy, the Estate

highlights evidence that the air filters had not been replaced for six months prior to

Torres's respiratory attack.  ECF No. 447-20 at 2.  The Estate provides a

manufacturer's note that indicates air filters should be replaced monthly.  ECF No.

447-21 at 3.

There is no constitutional right to high quality air filters or oximeters in the

nurse's office.  The only viable theory of a *Monell* policy that fits, here, is that

KSD's failure to obtain better equipment amounted to a "fail[ure] to implement

procedural safeguards to prevent constitutional violations."  *Gordon*, 6 F.4th at

973.  Therefore, the Estate must show that KSD's failure to obtain better

equipment was "substantially certain" to violate constitutional rights, and that KSD

was aware of the risk.  *Sandoval*, 985 F.3d at 682-83.  In other words, that KSD

was "deliberately indifferent" to the risk.[16]  *See Connick*, 563 U.S. at 61; *Park v.

City & Cnty. of Honolulu*, 952 F.3d 1136, 1141 (9th Cir. 2020).

---

[16] This "deliberate indifference" standard differs from that applied to state-created

danger claims against state actors discussed above.  *Compare Connick*, 563 U.S. at

ORDER - 32

In this context, deliberate indifference is assessed under an "objective standard," where "the facts available to city policymakers put them on actual or constructive notice that the particular omission is substantially certain to result in the violation of the constitutional rights of their citizens." *Castro*, 833 F.3d at 1076 (quoting *City of Canton*, 489 U.S. at 396) (quotation marks and emphasis omitted). "A pattern of similar constitutional violations . . . is ordinarily necessary to demonstrate deliberate indifference." *Connick*, 563 U.S. at 62.

The record suggests that KSD officials were aware of the hazard presented by smoke, the need for higher-quality air filters to deal with smoke, and that air filters should be replaced according to the manufacturer's recommendations. ECF No. 447-18 at 4; ECF No. 447-19. The record suggests that KSD knew oximeters would be useful for student health monitoring. ECF No. 488-4 at 12-13.

However, the record lacks evidence that KSD knew that its equipment would violate constitutional rights with substantial certainty, and that KSD disregarded that risk. In fact, the evidence suggests the opposite—Nurse Bakker explains that an oximeter is merely "a tool" among many and that they "may not be accurate." ECF No. 447-41 at 10. The Estate presents no evidence indicating that

---

61-62 *and Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 409-11 (1997) (*Monell* liability) *with Patel*, 648 F.3d at 974 (state-created danger exception).

air filters had been a problem in the past.  Colee testified that, facing wildfire smoke, the school attempted to get higher quality air filters installed but could not on short notice.  ECF No. 447-18 at 4-5.  KSD's attempt to get better air filters flatly contradicts the assertion that KSD choose to be indifferent to the risk presented by the air filters it had in place.

Even if the Court assumes that the Estate establishes these policies caused Torres's injury, there is no "pattern of similar constitutional violations" sufficient to demonstrate deliberate indifference.[17]  *See Connick*, 563 U.S. at 62.  No reasonable fact finder could conclude from the record that, by maintaining its nurses' offices and the air filters in the manner that it did, KSD disregarded a known or obvious risk that doing so would violate its students' constitutional rights.

---

[17] Further, the undisputed facts do not demonstrate circumstances falling within the Supreme Court's hypothesized single incident "deliberate indifference" liability. *See Connick*, 563 U.S. at 63-64.  No reasonable fact finder could conclude that a violation of the Constitution would be a "highly predictable consequence" of the equipment inadequacies outlined by the Estate.  *See id.*

ORDER - 34

b.  Inadequate Hiring

The Estate argues that KSD hired underqualified staff in positions responsible for students' medical safety.  ECF No. 512 at 15-16.  The Estate identifies Matthew Scott, a "high-ranking Director within KSD" whose job was to hire school nurses, and who hired Nurse Brun.  ECF No. 512 at 15.  The Estate argues that Scott "had no professional medical experience or qualifications" and that Nurse Brun's hiring materials were "riddled with inconsistencies."  ECF No. 512 at 15.  The Estate argues that Scott did not ensure Nurse Brun was trained properly.  ECF No. 512 at 16.  The Estate extrapolates that KSD's decision to trust Scott to hire and supervise nurses "was a reckless decision that wantonly exposed students throughout the district to serious harm."  ECF No. 512 at 17.

To be held liable under Section 1983 for a failure to train employees, the municipality's failure to train "must amount to deliberate indifference to the rights of persons with whom the [untrained employees] come into contact."  *Connick*, 563 U.S. at 61 (quotation marks omitted).  The Supreme Court has explained that "[a] municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train."  *Id.*

Similarly, liability for hiring practices faces a high bar.  *See Brown*, 520 U.S. at 410-12.  To hold a municipality liable for an employee's constitutional violation under the theory that the employee was inadequately scrutinized when hired, the

ORDER - 35

1    inadequacy of scrutiny must amount to "deliberate indifference." *Id.* at 411.  In

2    this context, deliberate indifference requires a plaintiff to show that adequate

3    scrutiny "would lead a reasonable policymaker to conclude that the plainly obvious

4    consequence of the decision to hire the applicant would be the deprivation of a

5    third party's federally protected right." *Id.*

6            Importantly, under either theory, the alleged deficiency in training or

7    screening must cause the particular constitutional injury at issue.  *City of Canton*,

8    489 U.S. at 391 ("[T]he identified deficiency in a city's training program must be

9    closely related to the ultimate injury."); *Brown*, 520 U.S. at 412 ("The connection

10   between the background of the particular applicant and the specific constitutional

11   violation alleged must be strong.").

12           The Estate does not attempt to explain how inadequate training or screening

13   resulted in a constitutional injury to Torres.  As explained at length above, the Due

14   Process Clause compels the state to render care only under certain limited

15   circumstances.  *Patel*, 648 F.3d at 971-72 (citing *DeShaney*, 489 U.S. at 198-202;

16   *Grubbs*, 92 F.3d at 900).  To the extent that the Estate argues Scott or Nurse Brun's

17   qualifications were insufficient to provide Torres medical care, the theory cannot

18   support a violation of the Fourteenth Amendment as a matter of law.

19           Further, the Estate cannot demonstrate that KSD's training or hiring policies

20   were adhered to with deliberate indifference.  A "showing of an instance of

ORDER - 36

1    inadequate screening is not enough to establish 'deliberate indifference.'" *Brown*,

2    520 U.S. at 411.  "A pattern of similar constitutional violations by untrained

3    employees is ordinarily necessary to demonstrate deliberate indifference for

4    purposes of failure to train." *Connick*, 563 U.S. at 62.  The Estate offers no other

5    instances where Scott, Nurse Brun, other directors, or other nurses, violated a

6    student's constitutional rights.  Even assuming that Scott and Nurse Brun were

7    underqualified for their jobs, the Estate offers no evidence that KSD was on notice

8    of that fact, or that its failure to train or screen would result in constitutional

9    violations.

10    Regarding Scott, the Estate offers that "[i]t is plainly obvious" that hiring

11    Scott was "risky."  ECF No. 512 at 15.  The Estate presents no evidence regarding

12    Scott's hiring, no resume, application questionnaire, or interview responses.  ECF

13    No. 512 at 15.  The Estate points to Scott's deposition where he admits to having

14    no medical experience.  ECF No. 512 at 15; ECF No. 447-11 at 3-4.  At trial, the

15    Estate would need to prove that adequate scrutiny of Scott's background would

16    have led a reasonable policymaker to conclude that hiring him would, plainly and

17    obviously, cause the deprivation of a third party's federally protected right.  *See*

18    *Brown*, 520 U.S. at 411.  The Estate offers no evidence to support such a finding.

19    Defendants' motion for summary judgment as to the Estate's Section 1983

20    claim arising out of any alleged inadequacies in hiring or staffing is granted.

ORDER - 37

1          c.  Nurse Staffing and Recordkeeping Policies

2          The Estate offers the following as KSD "policies" underlying its Section

3    1983 claim: (1) "[i]t was a formal policy . . . to assign school nurses to serve two

4    schools at the same time," ECF No. 512 at 16; (2) inadequacies in the "transition

5    meetings for special education students from elementary school to middle school,"

6    ECF No. 512 at 18; and (3) that KSD "had internal confusion and disagreements

7    regarding responsibility to complete IHP and Accommodation Plans," ECF No.

8    512 at 18.

9          It is not necessary a policy be "formal" to support a *Monell* claim.  *Gordon*,

10    6 F.4th at 974.  But the policy "must be so permanent and well settled as to

11    constitute a custom or usage with the force of law."  *Id.* (quotation marks omitted).

12    "Liability for improper custom may not be predicated on isolated or sporadic

13    incidents; it must be founded upon practices of sufficient duration, frequency and

14    consistency that the conduct has become a traditional method of carrying out

15    policy."  *Id.* (citation and quotation marks omitted).

16          The record indicates that it was KSD's policy to have nurses assigned to

17    multiple schools.  ECF No. 488-5 at 8.  However, there is no evidence that the

18    other two "policies" listed above were official in any respect.

19          Regarding transition meetings, it is unclear whether the Estate asserts that

20    KSD failed to adhere to its policy for Torres's transition, or that KSD's policy of

ORDER - 38

transition meetings, in general, was deficient.  ECF No. 512 at 18.  If the former,

"a single incident of unconstitutional activity is not sufficient to impose liability

under *Monell*."  *Gordon*, 6 F.4th at 974.  If the latter, the Estate offers no evidence

that what occurred with Torres's transition was consistent with KSD's policy, let

alone a deficient policy.  *See id.*  The record indicates that transition meetings

usually occur between school years.  ECF No. 447-40.  If there was a failure to

have one for Torres, the Estate fails to explain how the failure constituted a

"policy."  *See Gordon*, 6 F.4th at 974.

Regarding confusion as to who should complete medical documents, there is

evidence suggesting confusion at the school as to who was responsible.  *See* ECF

No. 488-18 at 4-8; ECF No. 488-19.  The Estate suggests there should have been

greater clarity.  ECF No. 512 at 18.  For this confusion to amount to a policy

supporting a *Monell* claim, the Estate must demonstrate KSD "had actual or

constructive knowledge that its practices were substantially certain to cause a

constitutional violation."  *Sandoval*, 985 F.3d at 682.  The Estate argues, and offers

evidence indicating, that an internal audit demonstrated that few students with

IHPs also had accommodation plans.  ECF No. 512 at 18 (citing ECF No. 486).

The drafting and implementation of accommodation plans may be relevant

to the Estate's ADA and Section 504 claims, but those federal rights are secured

through causes of actions pursuant to those statutes.  *See Okwu*, 682 F.3d at 845-

46; *Vinson*, 288 F.3d at 1156.  Here, the Estate must demonstrate that KSD's documentation policies ignored a risk of Due Process Clause violations, as that is the only viable basis for relief that the Estate identifies under its Section 1983 cause of action.  The record lacks evidence to support such a finding.  The Estate points to no other instances of constitutional injury resulting from these policies, and the risk presented by these policies is not so plain that a fact finder could find deliberate indifference in the record.  *See Connick*, 463 U.S. at 62; *Sandoval*, 985 F.3d at 682-83.

Further, the Estate fails to offer evidence supporting a "direct causal link between" these "policies" and a constitutional injury.  *Castro*, 833 F.3d at 1075. The Estate suggests that KSD nurses were under "administrative overload," ECF No. 512 at 16, that staff did not know who should fill out medical paperwork for students, and that a transition meeting might have helped Torres, ECF No. 512 at 18.  Even if KSD's policies failed to efficiently provide medical care to students, there is no constitutional right to medical care outside of the exceptions discussed above, which are not applicable to this case.  *Patel*, 648 F.3d at 971-72.

Defendants' motion for summary judgment as to the Estate's Section 1983 claims arising out of recordkeeping or nursing practices is granted.

ORDER - 40

d. Students Running with Smoke in the Air

The Estate argues that KSD had a policy of allowing students to jog while smoke was in the air. ECF No. 512 at 19. The Estate offers no incidents of students jogging on smoky days other than September 7, 2017. *See Gordon*, 6 F.4th at 974. The record lacks evidence to support a finding that it was KSD's "longstanding practice or custom" to have students run with smoke in the air. *See id.* at 973.

With a higher level of generality, the Estate's brief might be construed to argue that KSD failed to implement procedural safeguards to prevent its teachers from directing students to run with smoke in the air. To succeed in this theory, the Estate would need to further prove that KSD "had actual or constructive knowledge that" whatever procedures it had in place "were substantially certain to cause a constitutional violation." *Sandoval*, 985 F.3d at 682.

The record lacks evidence that KSD's procedures surrounding physical education class resulted in constitutional injury before. *See Connick*, 563 U.S. at 62. The Estate argues that KSD had "notice" of the risk of harm that running in smoke conditions would cause its students because the Washington State Department of Health ("DOH") issued advisories to restrict student activity in smoky air. ECF No. 512 at 18-19.

ORDER - 41

1    To hold KSD liable under *Monell*, the Estate must demonstrate that KSD

2 knew its policies were insufficient to protect students from certain harm.  *See*

3 *Sandoval*, 985 F.3d at 682-83.  More specifically, the Estate must show that,

4 (1) under KSD's policies, it was substantially certain that students would be made

5 to run indoors when the air outside was smoky that would cause them harm,

6 (2) KSD had actual or constructive notice its policies would cause such a result,

7 and (3) KSD ignored its notice.  *See id*.  The Estate offers no evidence of

8 substantial certainty, of notice, or of KSD ignoring notice.  The Estate can only

9 point to the fact that KSD received guidance from the DOH and that, in this

10 instance, a student was tragically harmed.

11    Deliberate indifference is a "stringent standard of fault."  *Connick*, 563 U.S.

12 at 61.  The record presented offers genuine disputes of fact on the question of

13 KSD's negligence, but Section 1983 requires more to hold a municipality

14 accountable under the Constitution.  *See Benavidez v. Cnty. of San Diego*, 993 F.3d

15 1134, 1153 (9th Cir. 2021) ("Mere negligence will not suffice to show *Monell*

16 liability.") (citation omitted).  Defendants' motion for summary judgment is

17 granted as to the Estate's Section 1983 claim against KSD.

18

19

20

ORDER - 42

**B. ADA and Section 504**

The Estate brings ADA and Section 504 claims against KSD.[18]  Title II of the ADA provides as follows:

> [N]o qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.

42 U.S.C. § 12132.  Section 504 provides as follows:

> No otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . . .

29 U.S.C. § 794(a).  "Title II and [Section] 504 include an affirmative obligation for public entities to make benefits, services, and programs accessible to people with disabilities."  *Updike v. Multnomah Cnty.*, 870 F.3d 939, 949 (9th Cir. 2017) (citations omitted).  Because ADA and Section 504 claims "are governed by the same substantive standard of liability," the Ninth Circuit often addresses ADA and

---

[18] The Estate's Second Amended Complaint indicates that "the ADA and 504 claims are not alleged against [Nurse Brun] in her individual capacity."  ECF No. 117 at 25-26 ¶ 6.9.

ORDER - 43

Section 504 claims together.  *Bax v. Drs. Med. Ctr. of Modesto, Inc.*, 52 F.4th 862, 867 n.4 (9th Cir. 2022*)* (citations omitted).

"To establish a claim under the ADA or [Section 504], [a plaintiff] must show: (1) he is a qualified individual with a disability; (2) he was denied a reasonable accommodation that he needs in order to enjoy meaningful access to the benefits of public services; and (3) the program providing the benefit receives federal financial assistance (for the [Section 504] claim) or is a public entity (for the ADA claim)."  *Csutoras v. Paradise High Sch.*, 12 F.4th 960, 968-69 (9th Cir. 2021) (citing *A.G. v. Paradise Valley Unified Sch. Dist. No. 69*, 815 F.3d 1195, 1204 (9th Cir. 2016) (quotation marks and alterations omitted).

Private plaintiffs seeking money damages "must clear an additional hurdle: proving a '*mens rea* of intentional discrimination' in the failure to accommodate, which 'may be met by showing deliberate indifference.'"  *Id.* at 969 (quoting *A.G.*, 815 F.3d at 1204).  This "deliberate indifference" test, distinct from those cited above, is met by demonstrating "[(1)] knowledge that a harm to a federally protected right is substantially likely, and [(2)] a failure to act upon that likelihood.'"  *Id.* (quoting *Duvall v. Cnty. of Kitsap*, 260 F.3d 1124, 1139 (9th Cir. 2001)).  This is a "high bar" requiring a plaintiff to demonstrate that "the school's response . . . or lack thereof was clearly unreasonable in light of the known

ORDER - 44

circumstances." *Id.* at 966 (quoting *Karasek v. Regents of Univ. of Cal.*, 956 F.3d 1093, 1105 (9th Cir. 2020)).

Claims for monetary relief under the ADA and Section 504 survive the injured party's death, to the extent the relief sought is compensatory. *Wheeler v. City of Santa Clara*, 894 F.3d 1046, 1057 (9th Cir. 2018). Broadly, claims for injunctive relief under these statutes are mooted by the plaintiff's death. *Muniz v. Pfeiffer*, 19-cv-233, 2019 WL 4596649, at *13 (E.D. Cal. Sept. 23, 2019); *Gaina v. Northridge Hosp. Med. Ctr.*, No. CV 18-177, 2018 WL 6264981, at *2 (C.D. Cal. Aug. 28, 2018) (citing *Meyers v. Cnty. of Los Angeles*, No. CV 10-5225, 2011 WL 7164461, at *2 (C.D. Cal. Dec. 19, 2011)).

Defendants seek summary judgment on the Estate's ADA and Section 504 claims, arguing that the Estate cannot demonstrate intentional discrimination. ECF No. 270 at 4-10. The Estate moves for summary judgment in part, arguing that the undisputed record demonstrates that each Defendant violated the ADA and Section 504. ECF No. 445 at 4-10.

The parties agree that Torres was an individual with a disability and needed accommodation to enjoy access to public education at KSD schools, and that KSD is subject to the ADA and Section 504. ECF Nos. 270, 445. The only relief that the Estate seeks under the ADA and Section 504 is money damages. ECF No. 117 at 31 ¶ 10.5.

1          The Estate's Second Amended Complaint explains that "[t]he ADA and 504

2    claims are not alleged against [Nurse Brun] in her individual capacity."  ECF No.

3    117 at 25-26 ¶ 6.9.  But, in the instant briefing, the Estate asks for "partial

4    summary judgment against Defendants KSD and [Nurse] Brun for breach of the

5    ADA."  ECF No. 445 at 2; *see also* ECF No. 512 at 3-9.  To be clear, the Estate did

6    not plead, and the law does not support, an ADA or Section 504 claim against a

7    defendant in her individual capacity.  *See Walsh v. Nev. Dep't of Human Res.*, 471

8    F.3d 1033, 1038 (9th Cir. 2006); *Purcell v. Am. Legion*, 44 F. Supp. 3d 1051,

9    1056-57 (E.D. Wash. 2014) (collecting cases); *Constantin v. Navarette*, No. 22-cv-

10   7075, 2023 WL 5725527, at *6 (N.D. Cal. Sept. 5, 2023).  Further, "a plaintiff

11   cannot bring an action under [Section] 1983 against a[n individual defendant] to

12   vindicate rights created by Title II of the ADA or [S]ection 504 of the

13   Rehabilitation Act."  *Vinson*, 288 F.3d at 1156.  Finally, an official capacity suit is

14   equivalent to a suit against the entity, and if both are pursued in one action, the

15   court may dismiss the officer as a redundant defendant.  *Ctr. for Bio-Ethical*

16   *Reform, Inc. v. Los Angeles Cnty. Sheriff Dep't*, 533 F.3d 780, 799 (9th Cir. 2008).

17   There is no viable claim under the ADA or Section 504 against Nurse Brun.

18          The Estate may succeed on its ADA and Section 504 claims for monetary

19   relief against KSD only upon a showing of intentional discrimination, including

20   deliberate indifference.  *See Csutoras*, 12 F.4th at 969.  The deliberate indifference

ORDER - 46

standard requires that KSD (1) knew Torres needed an accommodation, and (2) failed to act. *See id.* KSD may be held liable under the ADA and Section 504 for the acts of its employees. *See Duvall*, 260 F.3d at 1141; *Town of Colo. City*, 935 F.3d at 808-09.

To start, there is a documented record of KSD's notice. It is undisputed that KSD was aware of Torres's asthma since 2013. ECF No. 490 at 8-9. In 2013, Torres had a documented accommodation for asthma, including modifications to physical education. ECF No. 445 at 5 (citing ECF No. 447-38). The 2013 modifications are not specified in the record. ECF No. 447-38 at 3. The Estate presents an IEP form for Torres dated October 31, 2016, which indicates that he "has an IHP for Asthma." ECF No. 447-38 at 2. KSD contends that this record is a mistake. ECF No. 490 at 8 ¶ 79. The Court cannot resolve the dispute of fact at summary judgment.

Further, Ms. Torres testified that she notified KSD. She testified that Torres's elementary school was given doctors' letters stating Torres should not exercise, ECF No. 447-1 at 12, and that Torres's elementary school had a "protocol" for his asthma, ECF No. 447-1 at 14, 16.

It is undisputed that KSD knew Torres has asthma and had a prior accommodation before the start of the 2017-18 school year. However, whether KSD knew Torres needed to be excused from exercise at the start of the 2017-18

ORDER - 47

school year, or whether that need was "obvious," is a genuine dispute for the fact finder to resolve.  *Updike*, 870 F.3d at 951, 954.

KSD was given clearer notice at the start of the 2017-18 school year.  The evidence suggests that Ms. Torres went to HMS on August 29, 2017, dropped off Torres's inhaler, and asked a KSD employee to follow Torres's asthma protocol from the prior year.  ECF No. 519 at 3 ¶¶ 7-9.  Ms. Torres returned on September 6, 2017, to deliver Fix-Lanes's note and the IHP.  ECF No. 447-1 at 5-6; ECF No. 446 at 9 ¶ 40; ECF No. 490 at 5.  Fix-Lanes's note and the IHP indicated that that Torres had asthma, his asthma was life-threatening, and triggered by exercise and smoke.  ECF Nos. 447-24, 447-25.  Nurse Brun found Torres's IHP on the morning of September 7, 2017.  ECF No. 438 at 4 ¶ 12.  There is a dispute of fact as to whether she possessed Fix-Lanes's note as well.

It is therefore undisputed that someone at KSD was aware of Torres's need for accommodation, specifically, excusal from exercise, on September 7, 2017, and evidence further suggests KSD may have been made aware earlier.

It is a separate question whether KSD intentionally discriminated against Torres after learning of his disability.  Upon notice, an entity "is required to undertake a fact-specific investigation to determine what constitutes a reasonable accommodation."  *A.G.*, 815 F.3d at 1207 (quoting *Duvall*, 260 F.3d at 1139).  The ADA creates a "duty to gather sufficient information from the disabled individual

ORDER - 48

1  and qualified experts as needed to determine what accommodations are necessary."

2  *Duvall*, 260 F.3d at 1139 (quoting *Wong v. Regents of Univ. of Cal.*, 192 F.3d 807,

3  818 (9th Cir. 1999)) (alteration omitted).  If an entity is alleged to have "fail[ed] to

4  adequately investigate," it must "act[] deliberately" in its failure.  *Martinez v. Cnty.*

5  *of Alameda*, 512 F. Supp. 3d 978, 987 (N.D. Cal. 2021).  As the Ninth Circuit has

6  cautioned, "in some instances events may be attributable to bureaucratic slippage

7  that constitutes negligence rather than deliberate action or inaction, . . . deliberate

8  indifference does not occur where a duty to act may simply have been overlooked,

9  or a complaint may reasonably have been deemed to result from events taking their

10  normal course." *Duvall*, 260 F.3d at 1139-40.  The difference between the two is a

11  factual question.  *See id.* at 1140; *T.B. ex rel. Brenneise v. San Diego Unified Sch.*

12  *Dist.*, 806 F.3d 451, 471 (9th Cir. 2015) ("A reasonable jury might find that the

13  district was being deliberately indifferent . . . as opposed to merely negligent or

14  wrong[.]").

15      In the Estate's request for summary judgment, it argues that Fix-Lanes's

16  note and the IHP put KSD on notice of the need for many discrete

17  "accommodations" specified in those documents, as well as KSD's recordkeeping

18  policies and protocols for dealing with students' medical issues.  ECF No. 512 at

19  5-8.  The Estate posits that KSD immediately failed to provide these

20

1  accommodations on September 7, 2017.  ECF No. 445 at 5-10; ECF No. 512 at 5-

2  9.

3         The ADA and Section 504 were enacted to curb discrimination.  *See* 42

4  U.S.C. §§ 12101(b) (purposes of the Americans with Disabilities Act); 29 U.S.C. §

5  701(b) (purposes of the Rehabilitation Act of 1973).  The relevant inquiry is not, as

6  the Estate argues, whether Defendants "neglect[ed] students' medical

7  disabilities[.]"  ECF No. 445 at 4.  It is whether "[KSD] had notice of [Torres's]

8  need for an accommodation and failed to act."  *A.G.*, 815 F.3d at 1207.  The Estate

9  seeks to improperly expand the ADA and Section 504 into the realm of medical

10 negligence.  A failure to meet a certain standard of medical care, even one

11 statutorily prescribed or provided in an IEP, does not, alone, demonstrate

12 deliberate indifference.  *See T.B.*, 806 F.3d at 468-72.

13        The Estate fails to establish beyond dispute that KSD deliberately chose to

14 be indifferent to Torres's need for accommodation, rather than failed a standard of

15 care or made a mistake.  The Estate identifies a number of things that KSD "failed

16 to do" or "did not do," ECF No. 445 at 4-10; ECF No. 512 at 5-8, rather than

17 things KSD intentionally did.  The Estate's motion for summary judgment is

18 denied.

19        Turning to Defendants' motion, the Estate presents enough evidence for a

20 fact finder to determine that KSD was deliberately indifferent to Torres's need for

accommodation.  As explained above, there is sufficient evidence from which a reasonable fact finder could conclude that KSD was aware Torres needed excusal from physical education class before the 2017-18 school year began, in documents and in Ms. Torres's testimony.  There is sufficient evidence that a reasonable fact finder could conclude that Ms. Torres told KSD staff to accommodate Torres's asthma in the manner from previous school years, including excusal from exercise.

KSD argues that, on the record offered, the most that can be established is ordinary negligence.  ECF No. 489 at 6-7.  While the evidence suggests that Nurse Brun may have made mistakes on September 7, 2017, there are disputes of fact as to who else at KSD had knowledge of Torres's need for accommodation, and what lead to Torres attending physical education and running while smoke was in the air.  A reasonable jury could conclude that KSD negligently disregarded Torres's need for accommodation or was deliberately indifferent to that need.[19]  *See T.B.*, 806 F.3d at 472.

---

[19] There are three uses of the term "deliberate indifference" in this order.  It is perhaps important to distinguish why one deliberate indifference theory survives summary judgment and the two others do not: (1) With regard to the Estate's claim against Nurse Brun, there is no evidence supporting a jury finding that she was deliberately indifferent *to a danger that she created*.  *See* discussion *supra* Part

1    The parties' cross-motions for summary judgment on the Estate's ADA and

2    Section 504 claims against KSD are denied.

3                                    **CONCLUSION**

4    Defendants' motion for summary judgment as to the Estate's Section 1983

5    claims is granted as to both Defendants.  The Estate's motion for partial summary

6    judgment as to its Section 1983 claims is denied as moot.  Defendants' motion for

7    summary judgment as to the Estate's ADA and Section 504 claims against KSD is

8

9

_____

10    A.1.ii.  Here, there is a dispute of fact as to whether KSD, through all of its agents

11    and internal processes, choose to ignore Torres's *need for accommodation*.

12    (2) With regard to the Estate's *Monell* claim against KSD, there is no evidence that

13    KSD maintained a policy or practice that it knew would likely cause a

14    constitutional injury like the one alleged in this case.  *See* discussion *supra* A.2.i-

15    iv.  Here, KSD may be held liable under the ADA and Section 504 for the acts of

16    its employees.  *See Duvall*, 260 F.3d at 1141.  There is a dispute of fact as to

17    whether any of those employees disregarded Torres's need for accommodation.

18    Moreover, there is evidence suggesting that Torres's ADA and Section 504 rights

19    to be free of disability-based discrimination were violated, but none suggesting that

20    his constitutional rights were violated.  *See* discussion *supra* A.2.i-iv.

ORDER - 52

denied.  The Estate's motion for partial summary judgment related to its ADA or Section 504 claims is denied.

Accordingly, **IT IS HEREBY ORDERED:**

1.      KSD's and Tamara Brun's Motion for Partial Summary Judgment, **ECF No. 270**, is **GRANTED in part** and **DENIED in part**.

2.      The Estate's Motion for Partial Summary Judgment, **ECF No. 445**, is **DENIED** as to the arguments related to the federal claims.

        a.      The Court **RESERVES RULING** on the remaining arguments in **ECF No. 445** related to the state claims.

**IT IS SO ORDERED**.  The District Court Executive is directed to file this Order and provide copies to the parties.

DATED March 1, 2024.

*s/Mary K. Dimke*
MARY K. DIMKE
UNITED STATES DISTRICT JUDGE